UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JERAMEY R. BROWN,

        Plaintiff,

    v.

JOE GULASH, *et al.*,

        Defendants.

Case No. 07-cv-370-JPG-PMF

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by

defendants Joseph Gulash, Robert Hertz, Robert Hollenbeck, Brad Wells, John Lakin, Dennis

Fischer, Renee Stephenson, Rodney Schaake, Rick Pyatt, Maynard Hill, Steve Huch, Pete

Moore, Bob Richert, Officer Mark Spurgeon, Mike Hare, Matt Werner, Don McNaughton,

Maurice Lemarr, Myron Thompson, Officer Jeff Hartsoe, Jody Collman, Craig Richert

(collectively, the "Jail Defendants"), Jon McGuire, Kyle Napp, Jim Buckley, Bill Mudge, John

Gilbert, (collectively, the "County Defendants"), Travis, John Doe[1] and Madison County, Illinois

(Doc. 186). Plaintiff Jeramey R. Brown has responded to the motion (Doc. 230), and the

defendants have replied to that response (Doc. 236).

## I.    Background

Brown was convicted of murdering Michael Keller, a resident of Granite City, Illinois.

Prior to his trial, Brown was housed at the Madison County Jail ("Jail"). His conviction was

reversed on appeal, and the case was remanded for a new trial. While awaiting a new trial,

Brown was again housed in the Jail from January 2006 until July 2008. Brown's complaints in

---

[1]Defendants Travis and John Doe have been dismissed from this case pursuant to
Federal Rule of Civil Procedure 4(m) because Brown failed to serve them with process in
a timely manner.

this case arose from that detention. Brown is currently incarcerated at Menard Correctional Center.

On threshold review, the Court separated Brown's Complaint into ten counts and disposed of a number of them. The counts relevant to the pending motion are:

- **COUNT 1:** Against defendants Gulash, Hertz, Hollenbeck, Lakin, Fischer, and Madison County for violating Brown's right to freely exercise his religion in violation of the First Amendment by denying him the opportunity to fast during Ramadan;

- **COUNT 2:** Against defendants Gulash, Hertz, Hollenbeck, Lakin, Fischer, McGuire, Gilbert, and Madison County, Illinois for violating Brown's right to due process of law by confining him in administrative segregation for sixteen months;

- **COUNT 3:** Against defendants Gulash, Hertz, Hollenbeck, Fischer, Gilbert, and Madison County for violating Brown's First Amendment rights by restricting his ability to have magazines and books;

- **COUNT 4**: Against defendants Gulash, Hertz, Hollenbeck, Lakin, Gilbert, and Madison County for violating Brown's right to due process of law by denying him adequate exercise;

- **COUNT 5:** Against defendants Gulash, Hertz, Hollenbeck, Lakin, Fischer, Stephenson, Schaake, Pyatt, Hill, Hugh, Moore, Richert, Spurgeon, Hare, Werner, McNaughton, Lemarr, Thompson, Hartsoe, Collman, Richert, Gilbert, and Madison County for violating Brown's right to due process of law by subjecting him to conditions amounting to punishment–specifically loud noises depriving Brown of adequate sleep;

- **COUNT 8**: Against defendants Gulash, Hertz, Wells, Knapp, Buckley, Mudge, Gilbert, and Madison County for violating Brown's Sixth Amendment right to effective assistance of counsel by monitoring Brown's telephone calls with his attorneys. In its threshold review order, the Court dismissed Brown's claims in Count 8 based on an alleged Fourth Amendment violation based on the monitoring of his telephone calls generally; and

- **COUNT 10**: Against Defendants Gulash, Hertz, Wells, Lakin, Knapp, Buckley, Mudge, and Madison County for reading and copying Plaintiff's outgoing mail–including his legal mail–in violation of Plaintiff's rights.

## II.    Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

If the moving party is defending the claim at trial and does not have the burden of proof, it need not provide evidence negating the plaintiff's claim. It is enough to point to the absence of evidence to support an essential element of the plaintiff's claim for which it carries the burden of proof at trial *Celotex*, 477 U.S. at 322-23, 325. Where the defendant has pointed to a lack of evidence for one of the essential elements of a plaintiff's claim, if the plaintiff fails to provide

evidence sufficient to establish that element, there is no genuine issue of material fact. *Celotex*, 477 U.S. at 322-23.

Before moving to the issues involved in this motion, it is necessary to correct a misconception of the defendants about the evidence necessary to withstand summary judgment. In their reply, they state that self-serving affidavits without corroborating evidence cannot, on their own, resist summary judgment. They are wrong. Courts routinely find that a nonmoving party's own affidavit can constitute affirmative evidence to defeat a summary judgment motion. *See Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003). Cases that have made the statement that self-serving, uncorroborated and conclusory affidavits are not sufficient to withstand summary judgment have found the particular affidavits in issue insufficient not because they were self-serving but because they were not made on personal knowledge. *Id.* at 772. In truth,

> [p]rovided that the evidence meets the usual requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts.

*Id.* at 773. Much of Brown's evidence in this case satisfied this standard, and the Court will therefore consider it in opposition to the defendants' motion for summary judgment.

## III.    Analysis

The Court addresses each count or argument in turn, setting forth the relevant facts (viewed in Brown's favor), law and analysis as necessary to the Court's decision.

### A.    Count 2:  Confinement in Segregation Unit

During his initial confinement in the Jail beginning in April 2001, Brown was housed in the general jail population. However, Brown was reported for being involved in several fights, throwing urine and feces on and trying to stab another detainee and threatening defendants Jail

Superintendent Joseph Gulash, Lieutenant Hollenbeck and other Jail personnel. After threats to Jail personnel in January 2002, Brown was classified as a high security threat. Immediately after one particular altercation between Brown and another detainee in October 2002, Brown was moved temporarily into segregation without a hearing to separate him from the other detainee. A third detainee advised jail personnel that there would be more trouble between himself and Brown if Brown returned to the cell block.

Gulash viewed Brown's behavior as threatening to the security and order of the Jail and therefore, in October 2002, moved Brown to the segregation unit, ostensibly for the safety of Brown, other detainees and Jail personnel. The segregation unit had solid doors, so Brown's placement there served the additional purpose of preventing him from throwing urine or feces on Jail personnel. Brown never received a hearing regarding the decision to change his housing. He remained in the segregation unit until he left the Jail in April 2003 to be incarcerated at Stateville Correctional Center ("Stateville"). At Stateville, Brown was housed in the general population with no apparent problem.

After Brown's initial conviction was reversed, he was sent back to the Jail in January 2006 to await a new trial. Gulash continued to consider Brown a high security threat based on his prior behavior at the Jail and, without giving Brown a hearing or looking into his conduct at Stateville, decided to house him in the segregation unit again. Gulash made this decision to ensure the safety of Brown, other detainees and Jail personnel, not for disciplinary reasons. Brown remained in segregation until his conviction in his new trial in July 2008.

Conditions in the segregation unit were harsh for Brown. He was not allowed out of his cell except to see visitors once a week or for nurses' visits. True to its name, segregation meant Brown was socially isolated from other detainees. He did not have a television or source of

music and was not allowed access to a law library or recreation yard. He was not allowed to receive books or periodicals through the mail or to conduct unmonitored telephone calls with attorneys representing him in a civil case.

Brown argues the defendants violated the Due Process Clause of the Fourteenth Amendment when they confined him in segregation without a hearing or other due process of law. When a pretrial detainee complains that conditions or restrictions imposed by his detention deprive him of liberty without due process of law, "the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (footnotes omitted). In a nutshell, the government may detain a defendant charged with a crime, but it may not punish him. *Id.* at 536.

Whether a restriction imposed during pretrial detention amounts to punishment or a mere regulatory restraint depends on "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. If there is no expressed intent to punish, the determination generally turns on whether there is a legitimate non-punitive purpose for the restriction and whether the restriction is excessive to achieve that purpose. *Id.* (citing *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-69 (1963)). "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Wolfish*, 441 U.S. at 539. If the restriction is not reasonably related to a legitimate governmental purpose, the Court may infer that the purpose of the restriction is punishment. *Id.*

The effective, safe and secure management of the facility in which a detainee is housed is a legitimate non-punitive purpose for imposing restrictions on the detainee. *Id.* at 540. As a

result, while a jail cannot place a detainee in segregation to punish him, it may do so to protect him from future harm by other detainees or to protect jail staff from him.  *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002).  Whether a restriction will further the legitimate purpose of maintaining institutional security, order and effective management is a matter "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."  *Pell v. Procunier,* 417 U.S. 817, 827 (1974), *quoted in Wolfish*, 441 U.S. at 540 n. 23.

In the case at bar, the Jail Defendants argue that Brown was placed in segregation not for a punitive purpose but to deter additional confrontations with other detainees in the Jail, thereby protecting Brown, the other detainees and Jail personnel.  Additionally, placement in segregation diffused the danger to Jail personnel posed by Brown's threats of violence and prevent Brown from throwing urine and feces on others, as he had done in the past.  These are clearly legitimate purposes; Brown's conduct disrupted the Jail's operations and had the potential for confrontation and injury, and his presence in the general population threatened to spur violence from other inmates against him.  There is no evidence of an express intent to punish Brown by placing him in segregation in 2002, and his placement there facilitated the effective, safe and secure management of the Jail.

Furthermore, Brown's placement in segregation was not an excessive response to his behavior in light of his demonstrated inability to live peacefully in the general population and of the threats of another detainee to inflict injury on Brown.  As for the lack of creature comforts such as television or contact with other inmates, nothing in the Constitution required the Jail to make special accommodations for Brown to make him more comfortable than any other inmate

in segregation. To the extent other deprivations may have violated the Constitution, the Court addresses those issues in its discussion of other counts of this lawsuit.

Brown's placement in segregation in 2006, when he returned to the Jail, likewise was reasonably related to the legitimate non-punitive purpose of maintaining institutional security and order and facilitating effective management. Jail personnel knew Brown's history of conflict, disruption and threats from his earlier stay in the jail and took appropriate steps to prevent its recurrence in his second stay. The Constitution did not require Jail personnel to investigate his behavior at Stateville or to give him a second chance to behave well where, in the judgment of Jail personnel based on Brown's prior conduct, he still posed a threat to the safety, security and orderly management of the institution. Again, placement in segregation was not excessive in light of the perceived threat to himself and to others that he posed by being in the general population. Because Brown's placement in segregation was not punitive but preventative, the Jail Defendants and Madison County are entitled to summary judgment on Count 2.

Furthermore, in the absence of an underlying constitutional violation, any legal advice defendants Gilbert or McGuire, who were Madison County assistant state's attorneys at the time, might have given the Jail Defendants related to Brown's placement in segregation would not have violated the Constitution either. Thus, Gilbert and McGuire are also entitled to summary judgment on Count 2.

B.    Count 3:  Denial of Books and Periodicals[2]

Gulash testified that the Jail has a library and allows detainees to visit it "where time

_____

[2]The Jail Defendants treat this claim as including an access to the courts claim. However, as the Court's July 16, 2009, order (Doc. 10) makes clear, Brown does not complain of a lack of access to the courts in his complaint.

permits" after submitting a written request. According to Jail policy, detainees are allowed to remove two non-legal paperback books at a time; they cannot remove legal books. Gulash testified that Brown was allowed to use the library even when he was in segregation. Brown, on the other hand, denies that the jail had a general library, and the Court must take his assertion as true and find, for the purposes of this motion, that he was unable to receive books through a library at the Jail.

In addition, beginning in May 2006, the Jail did not allow detainees to receive any books by mail, even those mailed directly by bookstores or publishers. Gulash implemented this policy knowing Brown was soon expecting to receive books by mail directly from a bookstore. When those and other books arrived at the Jail, Jail personnel placed them in Brown's locker (to which he did not have access) without notifying him of their arrival. Brown requested an exception to the rule for certain self-help, educational and religious books, but his requests were denied. Gulash granted Brown's request to receive legal books as long as they came from his attorney. However, when Brown's attorney sent him a book about civil litigation, Gulash said the exception applied only to books about criminal law. The Jail also refused to allow Brown to receive a variety of magazines by mail on the basis that it deemed them "pornography."

Brown argues the defendants violated his First Amendment rights, applicable to the states via the Fourteenth Amendment, *see Gitlow v. New York*, 268 U.S. 652, 666 (1925); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 707 (7th Cir. 2003)*, by denying him access to books and magazines. Clearly, the restrictions on reading materials Brown can receive infringes on his constitutional rights. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996). However, "when a prison [or jail] regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S.

78, 89 (1987); *accord Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (applying standard to regulations on publications sent to facility). In making this determination, courts should be mindful that

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Safley*, 482 U.S.. at 84-85; *accord Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (noting courts "must accord substantial deference to the professional judgment of prison administrators"). Thus, the rational relationship test is appropriate: to determine whether a prison regulation is reasonable, a court must consider whether the regulation is rationally related to a legitimate governmental objective; whether alternative means of exercising the right remain open to the detainee; what impact an accommodation of the asserted right will have on guards and other detainees; and whether obvious alternatives to the regulation exist that show the regulation is an exaggerated response to prison concerns. *Safley*, 482 U.S. at 89-91.

In the specific context of the receipt of books or magazines by jail detainees, the Supreme Court has found constitutional a regulation that allowed inmates to receive hardback books by mail only from publishers, book clubs and bookstores that was adopted by a prison because of the difficulty of inspecting each incoming book for contraband. *Bell v. Wolfish*, 441 U.S. 520 (1979). It has also approved of a rule allowing a warden to reject a publication mailed to an inmate if he deems it detrimental to institutional security or if it could facilitate criminal activity. *Abbott*, 490 U.S. at 403 n. 1, 415-16.

In the case at bar, the Jail Defendants offer no justification whatsoever for their blanket restriction of books to Brown. As for magazines, Brown states in his complaint that those

publications were rejected because they were deemed to be pornography. While the Court can imagine legitimate reasons for banning pornography from jails, *see, e.g., Smith v. Donohue*, No. 91-1647, 1992 WL 238340, 6 (7th Cir. 1992), the Jail Defendants have presented no such justification in connection with the pending motion. In sum, the Jail Defendants have simply failed to carry their burden of showing they are entitled to judgment as a matter of law on Count 3.

For these reasons, the Court will deny the Jail Defendants' motion for summary judgment on Count 3.

C.    Count 4:  Adequate Exercise

During Brown's second stay at the Jail, the Jail had a policy of allowing detainees recreation in the secured outside recreation yard as often as possible considering the weather and the other tasks that needed to be performed at the Jail. When detainees could not go to the outside recreation yard, they were permitted to exercise in their cells. Brown was told he would get no out of cell exercise when he was placed in segregation. Nevertheless, he was taken from his cell to the outside recreation yard, but the evidence does not reflect with what frequency or for how long this was permitted. Brown describes being placed in a yard in leg shackles and handcuffs while Jail personnel searched and photographed his cell but he does not characterize that experience as out-of-cell exercise. He states that as a result of the lack of out-of-cell exercise for more than 30 months, he suffered pain and muscle atrophy.

Brown argues the Jail Defendants violated his Fourteenth Amendment due process rights to adequate exercise opportunities. The law is clear that "[l]ack of exercise may rise to a constitutional violation in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir.

1996). There is no bright line establishing how much exercise is enough. No outdoor exercise at all is insufficient, *see Spain v. Procunier*, 600 F.2d 189, 199-200 (9th Cir. 1979), but two and a half hours of exercise a week for an inmate in segregation has been found to be adequate, *see French v. Owens*, 777 F.2d 1250, 1255-56 (7th Cir. 1985). The Seventh Circuit Court of Appeals has hinted that five hours of out-of-cell exercise per week may have some constitutional significance, depending on the length and circumstance of the confinement. *Davenport v. De Robertis*, 844 F.2d 1310, 315 (7th Cir. 1988).[3]

Here, a reasonable factfinder could find that the instances (assuming there was more than one) occurring over a 30-month period where Brown was placed in the yard, handcuffed and shackled, for an unspecified period of time did not allow him adequate opportunity to exercise. Therefore, summary judgment on Count 4 is not warranted.

D.    Count 5:  Loud Noises

Jail regulations required Jail personnel to check Brown in his segregation cell every 30 minutes around the clock. To access his cell, it was necessary to pass through two steel doors. Regulations required that each door be closed and secured before passing to the next door or to Brown's cell area, and then again on the way out. Thus, each check required four door openings and closings, which caused a great deal of noise. In addition, the Jail Defendants would intentionally slam the doors with more force than necessary so as to shake the cell walls and Brown's bed. They would also sometimes set the bolt in the locked position when the door was open so that when the door was pushed closed, it would make noise but would not close. The

_____

[3]The cases cited applied Eighth Amendment standards to convicted prisoners. However, the Eighth Amendment standards can be appropriately applied to pretrial detainees under the Fourteenth Amendment for conditions of confinement cases since detainees are entitled to *at least* as much protection as convicted prisoners. *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

door would then have to be pushed closed a second time.  When Brown complained about the loud noise, the noise increased.  Because of these noises, Brown was unable to sleep at night.

At other unspecified times of day or night, some of the Jail Defendants would bang on and throw things at the back side of one of Brown's metal cell walls, also causing loud noise. On a few occasions during the daytime, some of the Jail Defendants banged on Brown's cell door repeatedly – once for as long as 20 minutes – or slammed the cell door.  On occasion, some of the Jail Defendants would laugh with each other about the noise created.  Essentially, the evidence, viewed in Brown's favor, paints a picture of intentional attempts to create noise to annoy Brown.

Brown argues the Jail Defendants violated his Fourteenth Amendment due process rights by depriving him of adequate sleep by creating loud noise.[4]  Sleep is, of course, one of the "minimal civilized measure of life's necessities," the touchstone for constitutional conditions of confinement.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Excessive noise on a nightly basis that interrupts or prevents sleep is a constitutional violation if it poses a serious risk of injury to the plaintiff.  *See Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996);  *Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994).  Mere annoyance is not enough.  *Lunsford*, 17 F.3d at 1580.

With respect to noises inherent in prison management, such as the opening and closing of cell doors, the Court again defers to jail administrators's judgment about how to maintain safety and security at the facility.  *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  However, where prison administrators use an otherwise legitimate security measure to harass a prisoner, the legitimacy of the measure will not shield it from liability.  *See Lewis v. Lane*, 816 F.2d 1165,

---

[4]Again, Eighth Amendment standards can be appropriately applied to pretrial detainees under the Fourteenth Amendment for conditions of confinement cases. *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

1171 (7th Cir. 1987) (summary judgment not warranted where jury could find prison guards tapped on cell bars to test the bars' strength in a manner designed to harass prisoners).

To establish whether noise levels were too loud to allow Brown sufficient sleep, the Court limits its consideration to evidence of loud noises at night during traditional sleeping hours, not those during the day. Brown has made no allegation that daytime noise from the Jail Defendants is excessive for traditional daytime activities. However, the Court will consider evidence of daytime noise to support an inference that the Jail Defendants' creation of unnecessary noise was intentional.

Based on the evidence viewed in Brown's favor, a reasonable jury could find the Jail Defendants intentionally created excessive noise every 30 minutes to prevent Brown from sleeping at night. There is evidence that the actual noise exceeded that necessary to perform the 30-minute cell checks, and it will be up to the jury to decide if the excessive noise actually existed and injured Brown.

E.    Absolute Prosecutorial Immunity

    1.    Gilbert[5]

Gilbert, a Madison County assistant state's attorney at the relevant times, argues that he is entitled to absolute prosecutorial immunity because he was performing a quasi-judicial role when he did the acts alleged. The remaining claims against Gilbert are Counts 3 (restriction on books and magazines), 4 (denial of adequate exercise), 5 (prevention of sleep) and 8 (recording telephone calls). Brown alleges that Gilbert was aware of the problems about which he

---

[5]Because the Court has already granted summary judgment in favor of McGuire on Count 2, the only claim against McGuire in this case, it does not address the remainder of his arguments in the motion for summary judgment. For the same reasons, it does not address Gilbert's additional arguments with respect to Count 2.

complains and failed to intervene to stop them from occurring. Brown alleges that with respect to Count 5 (prevention of sleep), Gilbert directed other defendants to provoke Brown into misbehaving because it would hurt Brown in his other litigation.

Gilbert characterizes his conduct as giving legal advice to the Madison County Sheriff's Department and Madison County officials. Indeed, Gilbert's affidavit demonstrates that he provided legal advice on the constitutionality of the conditions of Brown's confinement and the legality of specific conduct relating to Brown. Relying on *Henderson v. Lopez*, 790 F.2d 44 (7th Cir. 1986), he argues he has absolute prosecutorial immunity because he was performing a quasi-judicial role when he gave his legal advice.

Prosecutorial immunity bars damage suits against prosecutors for their actions within their quasi-judicial capacity, as opposed to their administrative or investigatory capacity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Spiegel v. Rabinovitz*, 121 F.3d 251, 256 (7th Cir. 1997); *Henderson*, 790 F.2d at 46. Prosecutorial immunity addresses concerns that "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976).

To determine if prosecutorial immunity applies, the Court must consider the nature of the function that the prosecutor was performing in the particular case, not merely to the title of the official. *Buckley*, 509 U.S. at 269; *Spiegel*, 121 F.3d at 256. Prosecutors are absolutely immune from § 1983 liability for their conduct in "initiating a prosecution and in presenting the State's case," *Imbler*, 424 U.S. at 431, as long as that conduct is "intimately associated with the judicial phase of the criminal process," *id.* at 430. For example,

> acts undertaken by a prosecutor in preparing for the initiation of judicial
> proceedings or for trial, and which occur in the course of his role as an advocate
> for the State, are entitled to the protections of absolute immunity. Those acts
> must include the professional evaluation of the evidence assembled by the police
> and appropriate preparation for its presentation at trial or before a grand jury after
> a decision to seek an indictment has been made.

*Buckley*, 509 U.S. 273. Even administrative decisions can be covered by absolute immunity *if they are directly connected with the conduct of a trial. See Van de Kamp v. Goldstein*, 862-64 (2009) (administrative functions relating to trial disclosure obligations). However, absolute prosecutorial immunity does not extend to gathering evidence in an investigation, *Buckley*, 509 U.S. at 273-74, or to giving legal advice to law enforcement, even if the advice concerns investigation of a crime that is ultimately prosecuted, *Burns v. Reed*, 500 U.S. 478, 492-96 (1991). The official seeking prosecutorial immunity bears the burden of showing that such immunity is justified. *Buckley*, 509 U.S. at 269; *Burns*, 500 U.S. at 486.

The holding of *Henderson*, on which Gilbert relies, that a prosecutor is entitled to absolute immunity for advising county officials, *Henderson*, 790 F.2d at 47, is no longer good law in light of *Burns* and *Buckley*. *See Blouin v. Spitzer*, 356 F.3d 348, 358 (2d Cir. 2004) (acknowledging *Henderson* was undercut by *Burns* and *Buckley*). Those cases firmly establish that a prosecutor's duties – such as advising law enforcement officers – that are not "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, are not protected by absolute prosecutorial immunity.

Gilbert has not carried his burden of showing he is entitled to absolute prosecutorial immunity for his actions in connection with Brown's complaint. *Henderson* does not govern this case; *Burns* and *Buckley* do. Those cases along with *Imbler* make clear that prosecutors are not entitled to absolute qualified immunity for actions not intimately associated with the judicial phase of the criminal process. Gilbert had virtually nothing to do with Brown's criminal trial –

or any other criminal trial, for that matter. His actions were clearly administrative and related to managing a jail within constitutional bounds, not to a criminal prosecution. That his conduct involved exercising his legal skills and giving legal advice does not bring that conduct within the protection of absolute prosecutorial immunity. Thus, he is not entitled to summary judgment on grounds of absolute prosecutorial immunity.

### 2. Mudge, Napp and Buckley

At the relevant times, Mudge was the Madison County state's attorney, and Napp and Buckley were assistant state's attorneys. In Count 8, Brown complains that Mudge, Napp and Buckley have been provided with and have reviewed copies of Brown's recorded telephone calls. In Count 10, Brown complains that Mudge, Napp and Buckley are somehow connected with obtaining copies of Brown's outgoing mail and, in some instances, with preventing the mail from reaching its destination. Presumably these actions were taken in order to obtain evidence useful in prosecuting Brown.

As with Gilbert, the conduct attributable to Mudge, Napp and Buckley is not intimately associated with the judicial phase of the criminal process. It is true that it appears Mudge, Napp and Buckley were involved somehow in Brown's criminal prosecution. However, their actions were not intimately associated with the judicial proceedings. Instead, their conduct was more akin to the evidence gathering in *Buckley* or advising law enforcement in *Burns*, both of which were found not to be subject to absolute prosecutorial immunity. Mudge, Napp and Buckley have not carried their burden of showing they are entitled to absolute prosecutorial immunity for their actions in connection with Brown's complaint.

### F. Qualified Immunity

Alternatively, the County Defendants argue they are entitled to qualified immunity.

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *accord Saucier v. Katz*, 533 U.S. 194, 206 (2001).

The qualified immunity test has two prongs: (1) whether the facts, taken in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 129 S. Ct. at 815-16; *see Saucier*, 533 U.S. at 201; *Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). While it is often beneficial to first inquire into whether the plaintiff has alleged a constitutional violation, the Court has discretion to address the second prong first in light of the circumstances of the case. *Pearson*, 129 S. Ct. at 818.

The County Defendants argue that the law was not clear at the time of their alleged conduct that a state's attorney or an assistant state's attorney could be liable for giving legal advice to state officers about the legality of an inmate's custody. They are wrong. Since the Supreme Court decided *Burns v. Reed*, 500 U.S. 478, 492-96 (1991), in 1991, the law has been clear that government attorneys can be liable for giving legal advice to law enforcement that results in a constitutional violation. The County Defendants have not advanced any other argument for qualified immunity, and the Court will not construct one for the.

For these reasons, the County Defendants are not entitled to summary judgment based on qualified immunity.

G.     Attorney-Client Privilege

Gilbert asks the Court to grant summary judgment in his favor because there is no evidence that he advised the Jail Defendants that their conduct toward Brown was constitutional. They note that Brown has no personal knowledge about any advice Gilbert gave and is therefore unable to testify about it.  Gilbert further believes that evidence about his advice is inadmissible as attorney-client privilege.

In response, Brown points to his own affidavit testimony that Gulash and Hollenbeck informed him of advice they had received from Gilbert and McGuire.  These statements by Gulash and Hollenbeck may be construed as a waiver of the attorney-client privilege for the statements.  *See Powers v. Chicago Transit Auth.*, 890 F.2d 1355, 1359 (7th Cir. 1989) ("Any voluntary disclosure by the holder of the attorney-client privilege is inconsistent with the attorney-client confidential relationship and thus waives the privilege.").  In the papers before the Court, Gilbert has not demonstrated conclusively that the privilege was not waived, although he may attempt to do so at trial.  *See United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991) ("The burden falls on the party seeking to invoke the [attorney-client] privilege to establish all the essential elements.").  The existence and the scope of any such waiver will be determined at that time.

H.     Count 8:  Monitoring and Recording Telephone Calls

At the relevant times, Gulash was the Jail superintendent; Hertz was the Madison County sheriff and Wells was an employee of the Madison County Sheriff's Department.  In Count 8, Brown complains that they were responsible for monitoring and recording his telephone calls,

even those to his attorneys. The Court has already dismissed Count 8 to the extent it relies on the Fourth Amendment because Brown has no expectation of privacy in his telephone calls from the jail (Doc. 10). Count 8 remains to the extent it relies on the Sixth Amendment, that is, that the monitoring of Brown's telephone calls to his *criminal* counsel interfered with his right to effective assistance of counsel in his *criminal* case. However, the Court has doubts about whether such an action is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). *Heck* held that the Court must dismiss any § 1983 claim that, if successful, would necessarily imply the invalidity of a conviction. *Id.* at 486-87. Here, it appears that if Brown successfully proves his Sixth Amendment rights were violated in preparation for his second criminal trial and that he lost at trial as a result, that finding would necessarily implicate the validity of his conviction. Accordingly, the Court will order Brown to show cause why this aspect of Count 8 should not be dismissed under *Heck*.

There is an additional aspect to Count 8 that was not explicitly recognized by the Court's threshold order: an alleged violation of Brown's right to access to civil counsel as a corollary to his First Amendment right to petition for a redress of grievances and Fourteenth Amendment due process right of access to the Courts. The Court recognizes now that Brown has stated an access to the courts claim as a part of Count 8.

Gulash, Hertz, Wells and Madison County ask the Court to dismiss the remaining parts of Count 8 on the grounds that, in June 2008 in a separate civil case regarding the conditions of Brown's confinement, Judge Wilkerson ordered the jail to permit Brown to speak with his attorney in that civil case by phone at least once a week for at least 30 minutes without recording or monitoring. They believe the issues are now moot because of that order. Brown was convicted and remanded to the custody of the Illinois Department of Corrections before the order

could be implemented.

Although it may have ensured no further violations would be committed, Judge Wilkerson's order did not moot any claims for damages from past violations such as those asserted in this case. Judge Wilkerson's order in no way resolves or moots Brown's present claims for damages for past violations.

Gulash, Hertz, Wells and Madison County also argue they are entitled to qualified immunity because at the time of the alleged violations it was not clear that jails could not monitor and record pretrial detainee telephone conversations, including conversations with their attorneys. They further argue that the monitoring and recording did not violate Brown's constitutional rights because those measures were justified by security needs.

To the extent Brown complains Gulash, Hertz, Wells and Madison County monitored or taped his conversations with non-lawyers, the defendants are entitled to qualified immunity. It is true that the law at the time clearly established jail officials could not *outright censor* out-going mail unless it furthered a substantial government interest such as security, order or rehabilitation and was no greater than necessary to achieve that purpose. *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989); *see Koutnik v. Brown*, 456 F.3d 777, 784 (7th Cir. 2006). However, the law at the time did not clearly establish that it was a constitutional violation for the defendants in Count 8 to *monitor or record* detainees' telephone conversations with non-lawyers. As Judge Wilkerson noted in his June 2008 order, "[c]oncerns regarding internal security often justify the monitoring of inmate communications." *Brown v. Madison County*, No. 04-cv-824-MJR, 2008 WL 2625912 (S.D. Ill. June 27, 2008) (citing *Martin v. Tyson*, 845 F.2d 1451, 1458 (7th Cir. 1988)); *see Kaufman v. McCaughtry*, 419 F.3d 678, 685 (7th Cir. 2005); *Altizer v. Deeds*, 191 F.3d 540, 547-48 (4th

Cir. 1999) ("Without question, the opening and inspecting of an inmate's outgoing mail is reasonably related to legitimate penological interests, and, therefore, constitutional. . . ."); *see also Wolff v. McDonnell*, 418 U.S. 539, 575-76 (1974) (noting that *Martinez*'s "freedom from censorship is not equivalent to freedom from inspection or perusal.").

To the extent Brown complains the defendants monitored or recorded his conversations with lawyers or lawyers' agents, the defendants are not entitled to qualified immunity. As Judge Wilkerson's June 2008 order noted:

> "[A]n inmates right of unfettered access to the courts is as fundamental a right as any other he may hold." *Adams v. Carlson*, 488 F.2d 619, 630 (7th Cir. 1973) (citing *Ex parte Hull*, 312 U.S. 546 (1941)). And there is "widespread agreement that communications by post between an inmate and his attorney are sacrosanct, subject only to tests on incoming mail for the presence of contraband which fall short of opening it when the inmate is not present. Oral intercourse has been hedged with similar protection." *Id.* at 631 (citations omitted). Inmates must, therefore, have a reasonable opportunity to seek and receive the assistance of counsel and where a regulation or practice unjustifiably interferes with this right it is invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974). Private communication with an attorney is a meaningful part of that access, *Dreher v. Sielaff*, 636 F.2d 1141, 1143 (7th Cir. 1980), and the privacy accorded to the attorney-client relationship must exist even in the prison context. *Adams*, 488 at 631. Further, that privacy is lost in the presence of a third party. *United States v. Evans*, 113 F.3d 1457, 1462 (7th Cir. 1997).
>
> * * *
>
> While a jail may limit inmate access to attorneys, unjustified obstruction of the right to representation is impermissible. [*Martinez*], 416 U.S. at 419. A regulation which compromises an inmate's constitutional rights must, therefore, be "reasonably related to a legitimate penological interest" in order to be valid. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Concerns regarding internal security often justify the monitoring of inmate communications, *Martin v. Tyson*, 845 F.2d 1451, 1458 (7th Cir. 1988), and deference is owed to jail administrator's decisions regarding a jail's operation, but more than bare assertions of security concerns is required to justify otherwise impermissible restrictions on inmate communications with their attorney. *Campbell v. Miller*, 787 F.2d 217, 227 (7th Cir. 1986). It is the defendant's burden to demonstrate the adequacy of the inmate's access to legal counsel and justify restrictions placed on that access. *Id.* ("Officials . . . have an affirmative duty to provide constitutionally adequate access . . . and bear the burden of demonstrating the adequacy of the means they

choose.").

*Brown v. Madison County*, No. 04-cv-824-MJR, 2008 WL 2625912, at *1-2 (S.D. Ill. June 27, 2008); *see also Tucker v. Randall*, 948 F.2d 388, 391 (7th Cir. 1991) ("Prison officials may tape a prisoner's telephone conversations with an attorney only if such taping does not substantially affect the prisoner's right to confer with counsel.").

Gulash, Hertz, Wells and Madison County have not carried their burden on summary judgment of showing that their conduct in monitoring and recording Brown's conversations with his attorneys (or their agents) did not interfere with Brown's right to confer with his counsel and were justified by a security need. Because the presence of a third-party monitor destroys the attorney-client privilege, monitoring Brown's conversations failed to protect his right of access to counsel. The defendants offered no more than a bare assertion of a security need, which is not enough to justify the infringement on Brown's rights. Likewise, taping conversations between Brown and his attorneys threatened to chill the communication between Brown and his counsel and does not appear to be justified by any institutional security need in light of the fact that the jail never used the recordings in any fashion, as the defendants represent in their motion. The legal principles involved in these findings were clearly established at the time of the defendants' conduct. Therefore Gulash, Hertz, Wells and Madison County are not entitled at this time to qualified immunity on the remainder of Count 8.

I.   Count 10: Reading and Copying Outgoing Mail

Gulash, Hertz, Wells, Lakin (also an employee of the Madison County Sheriff's Department) and Madison County seek summary judgment on Count 10 on qualified immunity grounds. In Count 10, Brown complains that the defendants were responsible for reading and copying his outgoing mail, including mail to his attorneys.

There is no significant difference between monitoring and recording telephone calls and monitoring and copying mail. Therefore, for reasons similar to those discussed in connection with Count 8, the Court will (1) grant the motion to dismiss Brown's claims in Count 10 against Gulash, Hertz, Wells, Lakin and Madison County to the extent they relate to his mail to non-attorneys and (2) deny the motion to dismiss Brown's claims in Count 10 against Gulash, Hertz, Wells, Lakin and Madison County to the extent they relate to his legal mail to attorneys or their agents.

The Court also has doubts about the viability of this claim to the extent in involves mail directed to Brown's counsel in his criminal case in light of *Heck v. Humphrey*, 512 U.S. 477 (1994). Thus, the Court will extend its show cause order to that portion of Count 10 as well.

J.     Gilbert, Wells, Napp, Buckley and Mudge:  No "duty" to Brown

Gilbert, Wells, Napp, Buckley and Mudge argue they cannot be liable for a constitutional tort under 42 U.S.C. § 1983 because they owed no duty to Brown. This argument is, in truth, a personal involvement argument. The Constitution creates duties that the defendants owed to the plaintiff (e.g., not to unduly infringe on his freedom of expression, not to create cruel and unusual conditions of confinement). However, a defendant can only be liable for those breaches if he was personally involved in them. "To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995); *accord Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006). An official is personally involved if he knows about the unconstitutional conduct and facilitates, approves, condones or deliberately turns a blind eye to it. *Johnson*, 444 F.3d at 584**;** *Gentry*, 65 F.3d at 561.

More recently, the Supreme Court has modified this standard by articulating an even

stricter one in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009). There, it held that a defendant can only be liable if a plaintiff establishes "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *See Iqbal*, 129 S. Ct. at 1948. "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 1949. Thus, after *Iqbal*, turning a blind eye to a violation may not be enough to establish personal involvement of a defendant if the constitutional violation itself demands a different mental state.

If Gilbert, Wells, Napp, Buckley and Mudge had some personal involvement in constitutional violations, they would be liable. For example, if they had the authority to direct the jail to violate Brown's constitutional rights and, in fact, directed them to do so, they could be sufficiently personally involved to be liable.

Brown alleges he sent Gilbert letters explaining how his constitutional rights were being violated but he never did anything to stop the violations. It is unclear what authority or responsibility Gilbert had over the treatment of inmates in jail. In the absence of any relevant argument from the parties applying personal involvement jurisprudence to the many claims against Gilbert, the Court cannot grant summary judgment on the claims against Gilbert at this time.

Brown also alleges Wells provided copies of his telephone calls and outgoing mail to Napp, Buckley and Mudge for their use in prosecuting his criminal case. To the extent this violated Brown's right of access to the Courts, Wells was certainly personally involved in that deprivation. As with Gilbert, it is unclear what role Napp, Buckley and Mudge played in any such deprivation or what authority they possessed to oversee and halt such violations. For this reason, the Court cannot grant summary judgment in their favor at this time.

K.      Gilbert, Wells, Napp, Buckley and Mudge:  Conspiracy under 42 U.S.C. § 1985(3)

These defendants ask the Court to dismiss Brown's § 1985(3) equal protection conspiracy claims, but he has not raised any such claims in his complaint.  To prove a violation of Section 1985(3), "a plaintiff must show . . . 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action' . . . ."  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).  Brown did not allege that anything set forth in the complaint was part of a conspiracy of class-based invidious discrimination, and the Court's threshold review order did not identify any § 1985(3) conspiracy claims.  This portion of the defendants' motion is moot.

L.      Madison County

Madison County remains as a defendant in Counts 1 (fasting during Ramadan), 3 (restrictions on books and magazines), 4 (denial of adequate exercise), 5 (prevention of sleep), 8 (recording telephone calls) to the extent it involves attorney calls, and 10 (reading and copying mail) to the extent it involves attorney mail.  It argues that there can be no municipal liability for Madison County based on the actions of Gulash, Hollenbeck, Wells, Lakin, Fischer, Stephenson, Shaake, Pyatt, Hill, Huch, Moore, R. Richert, Spurgeon, Hare Werner, McNaughton, Lemarr, Thompson, Hartsoe, Collman, C. Richert, McGuire, Napp, Buckley, Mudge and Gilbert because none of them are policy-makers for the county.

A municipality such as a county may not be held liable under §1983 on a *respondeat superior* theory.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  However, a municipality can be liable under § 1983 if (1) it had an express policy calling for constitutional violations, (2) it had a widespread practice of constitutional violations that was so permanent and

26

well settled as to constitute a custom or usage with the force of law or (3) if a person with final policymaking authority for the county caused the constitutional violation. *Monell*, 436 U.S. at 694; *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). A municipality is liable only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," is the moving force behind the constitutional violation. *Monell*, 436 U.S. at 694.

Brown implicitly concedes that Madison County cannot be vicariously liable for the conduct of Hollenbeck, Wells, Lakin, Fischer, Stephenson, Shaake, Pyatt, Hill, Huch, Moore, R. Richert, Spurgeon, Hare Werner, McNaughton, Lemarr, Thompson, Hartsoe, Collman, C. Richert, McGuire, Napp, Buckley, Mudge and Gilbert. He also does not contend Madison County had an express policy or a widespread practice of constitutional violations. He argues, however, that Madison County is liable for the conduct of Gulash because Gulash, as the Jail administrator, is a policymaker for Madison County. The Court focuses, then, on whether Madison County can be liable for Gulash's conduct under the third prong of *Monell*.

Hertz, Gulash and others employed by the Sheriff's Office are not policy-makers for Madison County. Under Illinois law, sheriff's deputies are employees of the sheriff, an independently elected constitutional officer who is not an employee of the county. Ill. Const. art. 7, § 4; 55 ILCS 5/3-6008; *Moy v. County of Cook*, 640 N.E.2d 926, 931 (Ill. 1994). As such, they are not under the control of the county and do not make policy for the county. *Id.* at 929; *Franklin v. Zaruba*, 150 F.3d 682, 685-86 (7th Cir. 1998); *Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995). Thus, Madison County cannot be liable in its own right based on the conduct of Hertz or his employees at the Jail, including Gulash.

Nevertheless, Madison County is a proper defendant in the current proceeding because it

will ultimately be responsible for paying any judgment against Hertz or his employees at the Jail. *See Robinson v. Sappington*, 351 F.3d 317, 339 (7th Cir. 2003) (citing *Carver v. Sheriff of LaSalle County*, 787 N.E.2d 127, 141 (Ill. 2003) ("Because the office of the sheriff is funded by the county, the county is therefore required to pay a judgment entered against a sheriff's office in an official capacity.")).  This payment responsibility means that "a county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer (sheriff, assessor, clerk of court, and so on) in an official capacity."  *Robinson*, 351 F.3d at 339 (citing Fed. R. Civ. P. 17 & 19; *Carver v. Sheriff of LaSalle County*, 324 F.3d 947, 948 (7th Cir. 2003)).  Therefore, the Court will not dismiss Madison County from this case, *see, e.g., White v. Madison County*, No. 07-cv-716-MJR, 2008 WL 3850265 *3-*5 (S.D. Ill. Aug. 14, 2008), although it limits its liability to paying the judgment incurred by those it funds.

 M. <u>Hertz, Lakin and Fischer:  Personal Involvement</u>

 Hertz, Lakin and Fischer argue that Brown has failed to establish they were personally involved in the alleged constitutional violations.  Brown's response points to sufficient evidence from which a reasonable jury could find Hertz, Lakin and Fischer were, under the standards set forth earlier in this order, personally involved in the conduct about which Brown complains.

 Hertz also asks the Court to dismiss Brown's claims against him in his official capacity because that is equivalent to a suit against the municipal entity itself.  Hertz argues that the municipality has no official policy or widespread custom or practice from which Brown suffers.  Hertz fails to realize that he, as sheriff, *is* the official policy-maker for the Sheriff's Office, an independent constitutional office.  *Browkaw v. Mercer Co.*, 235 F.3d 1000, 1013 (7th Cir. 2000) (citing *Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995)).  Thus, Hertz's conduct *is* the policy about which Brown complains, and there is no need for some further policy to

establish his liability.

**IV.    Conclusion**

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** the motion for summary judgment filed by defendants Joseph Gulash, Robert Hertz, Robert Hollenbeck, Brad Wells, John Lakin, Dennis Fischer, Renee Stephenson, Rodney Schaake, Rick Pyatt, Maynard Hill, Steve Huch, Pete Moore, Bob Richert, Officer Mark Spurgeon, Mike Hare, Matt Werner, Don McNaughton, Maurice Lemarr, Myron Thompson, Officer Jeff Hartsoe, Jody Collman, Craig Richert, Jon McGuire, Kyle Napp, Jim Buckley, Bill Mudge, John Gilbert, Travis, John Doe and Madison County, Illinois (Doc. 186);

- **GRANTS** the motion (Doc. 186) to the extent it seeks summary judgment:

  - in favor of defendants Gulash, Hertz, Hollenbeck, Lakin, Fischer, McGuire, Gilbert and Madison County on Count 2;

  - in favor of defendants Gulash, Hertz, Wells and Madison County on Count 8 for Brown's complaints regarding telephone calls with non-attorneys;

  - in favor of defendants Gulash, Hertz, Wells, Lakin and Madison County on Count 10 for Brown's complaints regarding outgoing mail to non-attorneys;

  - in favor of defendant Madison County on Counts 1, 3, 4, 5, 8 and 10 as well, except that Madison County will remain in this litigation as a necessary party responsible for paying any judgments against some other defendants;

- **DENIES** the motion (Doc. 186) in all other respects;

- **ORDERS** Brown to **SHOW CAUSE** on or before April 22, 2011, why the Court should not dismiss his claims in Counts 8 and 10 regarding communication with Brown's criminal defense attorneys in light of *Heck v. Humphrey*, 512 U.S. 477 (1994). The defendants may reply to Brown's response to the order to show cause on or before May 6, 2011. No brief shall exceed ten pages;

- **DIRECTS** the Clerk of Court to enter judgment accordingly at the close of the case.

The claims remaining in this case are:

- **COUNT 1:** Against defendants Gulash, Hertz, Hollenbeck, Lakin and Fischer for violating Brown's right to freely exercise his religion in violation of the First Amendment by denying him the opportunity to fast during Ramadan;

- **COUNT 3:** Against defendants Gulash, Hertz, Hollenbeck, Fischer and Gilbert for

violating Brown's First Amendment rights by restricting his ability to have magazines and books;

- **COUNT 4**: Against defendants Gulash, Hertz, Hollenbeck, Lakin and Gilbert for violating Brown's right to due process of law by denying him adequate exercise;

- **COUNT 5:** Against defendants Gulash, Hertz, Hollenbeck, Lakin, Fischer, Stephenson, Schaake, Pyatt, Hill, Hugh, Moore, Richert, Spurgeon, Hare, Werner, McNaughton, Lemarr, Thompson, Hartsoe, Collman, Richert and Gilbert for violating Brown's right to due process of law by subjecting him to conditions amounting to punishment–specifically loud noises depriving Brown of adequate sleep;

- **COUNT 8**: Against defendants Gulash, Hertz, Wells, Knapp, Buckley, Mudge and Gilbert for violating Brown's Sixth Amendment right to effective assistance of counsel and right of access to the Courts by monitoring Brown's telephone calls with his attorneys; and

- **COUNT 10**: Against Defendants Gulash, Hertz, Wells, Lakin, Knapp, Buckley and Mudge for reading and copying Plaintiff's outgoing–including his legal mail–in violation of Plaintiff's rights.

Madison County also remains as a necessary party to this case.

**IT IS SO ORDERED.**
**DATED:  March 22, 2011**

s/ J. Phil Gilbert

**J. PHIL GILBERT**
**DISTRICT JUDGE**